**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOEL DUGUAY, PATRICIA PRICE, ELIZABETH BALDWIN and SARA MORIZIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SARATOGA HOSPITAL, MARCY DREIMILLER, ANGELO CALBONE, GARY FOSTER, JEFF METHVEN, MICHAEL BATTLE, KARYN ROBERTSON, KAREN COX, TALLAH WOYKOWSKI, KATHY LAFOND, JILL VANKUREN, CHRISTOPHER JENKINS, PATRICIA GAVIS, N. KEITH STEWART and FRANK MESSA,<br><br>Defendants. | Case No.: 1:24-cv-01125-AMN-PJE<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Joel Duguay, Patricia Price, Elizabeth Baldwin and Sara Morizio ("Plaintiffs"), individually and as representatives of the Class defined herein, and on behalf of the Retirement Plan of Saratoga Hospital (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§1001-1461 ("ERISA") against Defendant Saratoga Hospital (the "Hospital") and current and past members of the Hospital's Retirement Committee: Marcy Dreimiller, Angelo Calbone, Gary Foster, Jeff Methven, Michael Battle, Karyn Robertson, Karen Cox, Tallah Woykowski, Kathy LaFond, Jill VanKuren, Christopher Jenkins, Patricia Gavis, N. Keith Stewart and Frank Messa ("Individual Defendants", and together with the Hospital, "Defendants") for breaching their fiduciary duties in the management, operation and administration of the Plan. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

1

**INTRODUCTION**

1.      Plaintiffs are participants in an ERISA defined contribution plan sponsored by the Hospital. Today, 26 U.S.C. § 401(k) and § 403(b) defined contribution plans, where employees bear the market risk and must pay the fees and expenses of the investment options, have become America's primary retirement system. Unlike defined-benefit pensions, which provide set payouts for life and where employer assumes the risks and pays the fees and expenses of the investment, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of these plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.[1] These retirement funds are significant to the welfare of the class. Plaintiffs estimate that Defendants have caused losses of at least $3.1 million to the Plan in total since 2018.

2.      The marketplace for services for defined contribution plans is established and competitive. As an ERISA fiduciary to the Plan, Defendants are obligated to act for the *exclusive* benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982); *Chao v. Hall Holding Co*., 285 F.3d 415, 426 (6th Cir. 2001). In discharging these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co*., 806 F.3d 377, 388 (6th Cir. 2015); see also *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments as well as a continuing duty to monitor fees and

---

[1]      Nancy Trejos, Retirement Wreck, Washington Post (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 - 1829 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.")

3.      In this case, Defendants failed to meet their fiduciary obligations in basic ways. *First*, the Plan offered and maintained higher cost share classes when lower cost share classes of the same mutual funds were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns. This is one of the most common and well-known example of an imprudent investment decision.[2] An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring mutual fund share classes. For a large plan of approximately $267,730,682 in net assets (as of end 2022), such as this Plan, a fiduciary using a viable methodology will monitor the Plan's investment options continuously to immediately take advantage of share class discounts as they become available. Information regarding share class discounts is made available to the public as part of the online EDGAR database maintained by the

---

[2]      The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure that advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf ; *See also* FINRA 2016 Regulatory and Examination Priorities Letter, available at https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf.

SEC. Defendants however failed to monitor the share classes of mutual fund investments and to substitute less expensive share classes of mutual funds from more expensive share classes of the very same mutual fund, thus wasting the assets of the Plan participants. This could have been easily remedied only if Defendants had a viable review process and methodology, which they neglected to keep and implement, violating their fiduciary duties.

4.      *Second*, Defendants wasted participants' money by failing to implement a prudent methodology to appropriately select and monitor the Plan's stable value fund. Substantially similar products were available from other providers that would have provided far higher, guaranteed returns to the Plan participants. Had Defendants monitored and evaluated the returns on the Plan's stable value fund, they would have realized that the Plan's stable value fund was an underperforming fund throughout the entire Class Period and that the Plan's parties in interest were benefitting from the returns on the stable value fund, at the cost of the Plan's participants.

5.      *Third*, Defendants failed to implement a prudent process to monitor the Plan's fees and expenses. As a result, the Plan kicked back payments to recordkeepers and other non-parties from the retirement savings of the Hospital's employees in excessive amounts.

6.      Pertinently, Plaintiffs are not merely second-guessing Defendants' investment decisions with the benefit of hindsight. The information Defendants needed, to make informed and prudent decisions, was readily available when the decisions were made. Defendants however failed to make prudent decisions and breached their fiduciary obligations. Plaintiffs, individually and as representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of

4

fiduciary duties, and to restore to the Plan any lost profits. Plaintiffs also seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

**JURISDICTION AND VENUE**

7.    Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

8.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

9.    This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one of the Defendant is located.

**PARTIES**

**Plaintiffs**

10.    Plaintiff Joel Duguay was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period[3] because he and his beneficiaries were eligible to receive benefits under the Plan. During the Class Period, Plaintiff Duguay invested in the Plan's

---

[3]    Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ." 29 U.S.C. § 1113. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the Class Period begins six years before the date of the filing of the initial Complaint.

stable value fund, along with the other challenged funds, the Metropolitan West Total Return Bond and Federated Hermes Opportunistic High Yield Bond Service. Plaintiff Duguay was also harmed by the Plan's excessive administrative fees. As a result, Plaintiff Duguay has been financially harmed by Defendants' unlawful conduct. This information is known to Defendants as Defendants have control and possession of all Plan participants' records. Plaintiff Duguay's account would have been worth more had Defendants not violated ERISA as described herein. Plaintiff Duguay became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

11.    Plaintiff Patricia Price was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. Plaintiff Price invested in the Plan's stable value fund and was harmed by Defendants' unlawful conduct. Plaintiff Price became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

12.    Plaintiff Elizabeth Baldwin was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. Plaintiff Baldwin has been harmed by Defendants' unlawful conduct and became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

13.    Plaintiff Sara Morizio was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. Plaintiff Morizio has been harmed by Defendants' unlawful conduct and became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

**The Plan**

14.    The Plan was established effective March 1, 1989. The Plan is a defined contribution plan, within the meaning of 29 U.S.C. § 1002(34), covering substantially all employees of the Hospital, who have met the requirements of the Plan. As of December 31, 2022, the Plan had 4031 participants with account balances and $267,730,682 in net assets.

**Defendants**

15.    Defendant Hospital maintains its place of business at 211 Church Street, Saratoga Springs, NY 12866. The Plan's annual Form 5500 Reports filed during the Class Period identify the Hospital as the Plan's sponsor and Administrator.

16.    Thus, the Hospital is a fiduciary to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because it has the sole authority to amend or terminate, in whole or part, the Plan, and has discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available.

17.    Defendant Marcy Dreimiller served as an Associate Vice President of Human Resources and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. § 1002(21)(A)(i).

18.    Defendant Angelo Calbone served as President and Chief Executive Officer and a member of the Plan's Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control

7

over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. § 1002(21)(A)(i).

19.     Defendant Gary Foster served as Vice President and Chief Financial Officer and a member of the Plan's Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

20.     Defendant Jeff Methven served as Executive Vice President and a member of the Plan's Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

21.     Defendant Michael Battle served as a Director of Financial Accounting and a member of the Plan's Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

22.     Defendant Karyn Robertson served as a Benefits Administrator and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the

8

administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

23. Defendant Karen Cox served as a Benefits Administrator and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

24. Defendant Tallah Woykowski served as a Provider Compensation and Contracts Coordinator and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

25. Defendant Kathy LaFond served as Vice President of Human Resources and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

26. Defendant Jill VanKuren served as President and Chief Executive Officer and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection

and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

27. Defendant Christopher Jenkins served as Director of Finance and a member of the Plan's Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

28. Defendant Patricia Gavis served as Chief Financial Officer and a member of the Plan's Retirement Committee during the Class Period. She attended meetings of the Retirement Committee during the Class Period. She exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, she is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

29. Defendant N. Keith Stewart served as a member of the Hospital's Board of Directors and Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

30. Defendant Frank Messa served as a member of the Hospital's Board of Directors and Retirement Committee during the Class Period. He attended meetings of the Retirement Committee during the Class Period. He exercised discretionary authority and control over the administration of the Plan and the management of its assets, including the selection and monitoring of the Plan's investment options. Therefore, he is a fiduciary under 29 U.S.C. §1002(21)(A)(i).

10

31.     Though not named as Defendants, certain service providers are fiduciaries to the Plan participants and are parties in interest in the matter. State Street Bank and Trust Company serves as custodian to the Plan for certain investments, and Transamerica Retirement Solutions, LLC ("Transamerica") serves as the Plan's recordkeeper. These entities are a "party-in-interest" to the Plan.

## **DEFENDANTS' FIDUCIARY OBLIGATIONS**

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. §1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

33.     29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

34.     29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Transamerica is a "parties in interest" under 29 U.S.C. §1106(a)(1)(C) and 29 USC § 1002(14).

35.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

36.    29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

**DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS**

37.    Plaintiffs have relied upon limited documents provided by Defendant Hospital, including quarterly statements provided to the Plaintiffs, the Plan's Annual Form 5500 Reports filed during the Class Period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), the Plan's 404a-5 participant disclosures, other

12

publicly available Form 5500 Reports, and mutual fund prospectuses available on SEC's EDGAR database.

## FACTUAL ALLEGATIONS

38.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34).

**A.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

39.    A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership in the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

40.    Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (i.e. sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical - the managers, investment styles, and stocks are not merely similar, but identical. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the class chosen. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan since

institutional investors make large fund share purchases, and higher-class shares are typically retail class shares which are available to a broader spectrum of investors. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

41.    Defendants had access to these low-cost institutional share classes of mutual funds, as the Plan could easily meet the minimum investment requirements. Instead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, Defendants instead offered higher cost mutual fund share classes as investment options for the Plan. Thus, the Plan fiduciaries wasted the assets of the Plan by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the plan menu. This failure continued from the beginning of the class period until at least 2022 (the latest year for which details of investment options were currently available to Plaintiffs before filing of the initial Complaint).

42.    The following are instances, in which Defendants wasted money by failing to select the lowest-cost share class of the mutual fund as an investment option for the Plan:

43.    Defendants chose Metropolitan West Total Return Bond as an investment option available to participants in or prior to 2018. Defendants chose to invest in share class "I" in 2018. As per the Plan's 404a-5 disclosures, as of June 5, 2018, the Plan's chosen share class "I" had the expense ratio of 0.44% for the year 2018. During the same year, other shares classes such as the

plan class had an expense ratio of 0.37% (as of July 27, 2018).[4] This option was available to the Plan and easily identifiable. Defendants however continued to keep its investments in share class "I" which had a significantly higher expense ratio until 2022, incurring 0.45% for the year 2019, 0.44% for 2020, 0.46% for 2021, 0.45% for 2022, 0.44% for 2023 and 0.45% for 2024. During this same time, plan class had an expense ratio of 0.37% for 2019,[5] 0.38% for 2020,[6] 0.37% for 2021,[7] 0.36% for 2022[8] and 0.37% for 2023.[9] From the information available in the fund's publicly available prospectus, Defendants should have known of this option. The prospectuses noted that minimum investment requirements could be waived. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

44.    Defendants chose Federated Hermes Opportunistic High Yield Bond as an investment option available to participants in or around 2018. Defendants chose to invest in the service share class in 2018. As per the Plan's 404a-5 disclosures, as of June 5, 2018, the Plan's chosen share class had a net expense ratio of 0.98% for the year 2018. During the same time, another shares class "R6" had a net expense ratio of 0.72%, as of April 30, 2018.[10] This option

---

[4]    *See* Form 497K, MetWest Total Return Bond Fund, Summary Prospectus (July 27, 2018), sec.gov/Archives/edgar/data/1028621/000119312518229579/d536271d497k.htm.

[5]    *See* Form 497K, MetWest Total Return Bond Fund, Summary Prospectus (July 29, 2019), sec.gov/Archives/edgar/data/1028621/000119312519205257/d717055d497k.htm.

[6]    *See* Form 497K, MetWest Total Return Bond Fund, Summary Prospectus (July 29, 2020), sec.gov/Archives/edgar/data/1028621/000119312520202328/d926827d497k.htm.

[7]    *See* Form 497K, MetWest Total Return Bond Fund, Summary Prospectus (July 29, 2021, as amended December 31, 2021), https://www.sec.gov/Archives/edgar/data/1028621/000119312521370670/d242969d497k.htm.

[8]    *See* Form 497K, MetWest Total Return Bond Fund, Summary Prospectus (July 29, 2022), sec.gov/Archives/edgar/data/1028621/000119312522206321/d312204d497k.htm.

[9]    *See* Form 497K, MetWest Total Return Bond Fund, Summary Prospectus (July 29, 2023), sec.gov/Archives/edgar/data/1028621/000119312523195819/d426510d497k.htm.

[10]    *See* Form 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (April 30, 2018),

was available to Defendants and easily identifiable, as it was disclosed in the Federated Hermes Opportunistic High Yield Bond's summary prospectuses. Moreover, these prospectuses noted that share class "R6" had no investment minimum requirements, and the Plan' chosen share class had a minimum of around $1,000,000. Defendants, however, continued to keep its investments in the service share class which had the significantly higher net expense ratio of 0.98% until 2024. During this same time, share class "R6" had an expense ratio of 0.72% throughout.[11] In fact, another share class "IS" also had a lower expense ratio of 0.73% throughout.[12] From the information available in the fund's publicly available prospectus, Defendants should have known of these options. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

45.     Defendants chose PGIM Global Total Return as an investment option available to participants in 2019. Defendants chose to invest in share class "Z" in 2019. As per the Plan's 404a-5 disclosures, as of June 5, 2019, the Plan's chosen share class "Z" had a net expense ratio of 0.63% for the year ending 2019. During the same year, other shares classes such as share class

---

sec.gov/Archives/edgar/data/745967/000162363218000551/fhytq450212sumproedg.htm.

[11]     *See* Form 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (June 30, 2019), sec.gov/Archives/edgar/data/745967/000162363219000801/fhytq450212sumproedg.htm;    Form 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (April 30, 2020), sec.gov/Archives/edgar/data/745967/000162363220000948/fhytq450212sumproedg.htm;    Form 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (April 30, 2021), sec.gov/Archives/edgar/data/745967/000162363221000509/fhohyq450212sumproedg.htm; 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (April 30, 2022), sec.gov/Archives/edgar/data/745967/000162363222000563/fhohyq450212sumproedg.htm; 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (April 30, 2023), sec.gov/Archives/edgar/data/745967/000162363223000571/fhohyq450212sumproedg.htm; 497K, Federated Hermes Opportunistic High Yield Bond, Summary Prospectus (April 30, 2024), sec.gov/Archives/edgar/data/745967/000162363224000551/fhohyq450212sumproedg.htm.

[12]     *Id*.

"R6" had a net expense ratio of 0.56% (as of December 27, 2019).[13] This option was available to Defendants and easily identifiable, as it was disclosed in the PGIM Global Total Return's summary prospectus and the Plan met all criteria and investment minimums. Defendants however continued to keep the Plan's investments in share class "Z" which had a higher expense ratio until 2024, incurring a net expense ratio of 0.63% for the years 2020-2023 and 0.64% for the year 2024. During this same time, share class "R6" had a net expense ratio of 0.58% throughout.[14] From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

46.    Defendants chose John Hancock Disciplined Value Mid Cap Fund as an investment option available to participants in or prior to 2018. Defendants chose to invest in share class "I" in 2018. As per the Plan's 404a-5 disclosures, as of June 5, 2018, the Plan's chosen share class "I" had the net expense ratio of 0.86% for the year ending 2018. During the same year, other shares classes such as share class "R6" had a net expense ratio of 0.76% (as of July 1, 2018).[15] This option was available to Defendants and easily identifiable, as it was disclosed in the John Hancock Disciplined Value Mid Cap Fund's summary prospectus and the Plan met all criteria and

---

[13]    *See* Form 497K, PGIM Global Total Return, Summary Prospectus (December 27, 2019), sec.gov/Archives/edgar/data/793159/000168386319003309/f2291d1.htm.

[14]    *See* Form 497K, PGIM Global Total Return, Summary Prospectus (December 30, 2020), sec.gov/Archives/edgar/data/793159/000168386320015537/f7758d1.htm; Form 497K, PGIM Global Total Return, Summary Prospectus (December 29, 2021), https://www.sec.gov/Archives/edgar/data/793159/000168386321007436/f10634d1.htm; Form 497K, PGIM Global Total Return, Summary Prospectus (December 30, 2022), https://www.sec.gov/Archives/edgar/data/793159/000168386322008063/f23922d1.htm; Form 497K, PGIM Global Total Return, Summary Prospectus (December 29, 2023), https://www.sec.gov/Archives/edgar/data/793159/000168386323008672/f37247d1.htm.

[15]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (July 1, 2018) (as revised July 9, 2018), sec.gov/Archives/edgar/data/1329954/000113322818004428/e498194_497k.htm.

investment minimums. Defendants however continued to keep the Plan's investments in share class "I" which had a significantly higher expense ratio, incurring a net expense ratio of 0.85% in 2019, 0.86% for the years 2020-2022, 0.85% for the year 2023 and 0.86% for 2024. During this same time, share class "R6" had a net expense ratio of 0.76% (as of August 1, 2019) [16] and 0.75% until end of the year 2023.[17]   From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

47.    Defendants chose Fidelity Advisor Small Cap Value as an investment option available to participants in or around 2018. Defendants chose to invest in share class "I" in 2018. As per the Plan's 404a-5 disclosures, as of June 5, 2018, the Plan's chosen share class "I" had a net expense ratio of 0.98% for the year ending 2018. During the same year, other share classes such as share class "Z" had a net expense ratio of 0.77% (as of September 29, 2018).[18] This option was available to Defendants and easily identifiable, as it was disclosed in the Fidelity Advisor

---

[16]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2019),
sec.gov/Archives/edgar/data/1329954/000113322819004941/jhfiii-html1474_497k.htm.
[17]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2020),
sec.gov/Archives/edgar/data/1329954/000113322820004784/jhfiiidvmcf-html2835_497k.htm;
Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2021)   https://www.sec.gov/Archives/edgar/data/1329954/000113322821004156/jhfiiidvmcf-html3889_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2022)
https://www.sec.gov/Archives/edgar/data/1329954/000113322822005192/jhdvmcf-html5285_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus (August 1, 2023),
https://www.sec.gov/Archives/edgar/data/1329954/000119312523199513/d519336d497k.htm.
[18]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 29, 2018), sec.gov/Archives/edgar/data/754510/000137949118005292/filing416736955.htm.

Small Cap Value's summary prospectus and the Plan met all criteria and investment minimums. Defendants however continued to keep the Plan's investments in share class "I" which had a higher expense ratio until 2024, incurring a net expense ratio of 0.91% for 2019, 0.66% for 2020, 0.95% for 2021, 0.98% for 2022, 0.99% for 2023 and 1.04% for 2024. During this same time, share class "Z" had a net expense ratio of 0.52% for 2019,[19] 0.81% for 2020,[20] 0.85% for 2021,[21] 0.87% for 2022,[22] 0.90% for 2023[23] and 0.91% for 2024.[24]  From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

48.    Defendants chose MFS Research International Fund as an investment option available to participants in or around 2021. Defendants chose to invest in share class "R3" in 2021. As per the Plan's 404a-5 disclosures, as of June 5, 2021, the Plan's chosen share class "R3" had a net expense ratio of 1.07 % for the year ending 2021. During the same year, other share classes such as share class "I" and "R4" had a net expense ratio of 0.77% and share class "R6" had a net expense ratio of 0.67% (as of December 29, 2021).[25] These options were available to Defendants

---

[19]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 28, 2019), sec.gov/Archives/edgar/data/754510/000137949119004214/filing525002234.htm.

[20]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 29, 2020), sec.gov/Archives/edgar/data/754510/000137949120004869/filing633399780.htm.

[21]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 29, 2021),
https://www.sec.gov/Archives/edgar/data/754510/000137949121004130/filing729862595.htm.

[22]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 29, 2022), sec.gov/Archives/edgar/data/754510/000137949122003555/filing835227870.htm.

[23]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 29, 2023), sec.gov/Archives/edgar/data/754510/000075451023000094/filing7039.htm.

[24]    *See* Form 497K, Fidelity Advisor Small Cap Value, Summary Prospectus (September 29, 2023), sec.gov/Archives/edgar/data/754510/000119312524054757/d713629d497k.htm.

[25]    *See* Form 497K, MFS Research International Fund, Summary Prospectus (December 29, 2021), sec.gov/Archives/edgar/data/798244/000110465921153814/a21-30597_8497k.htm.

and easily identifiable, as they were disclosed in the MFS Research International Fund's summary prospectus and the Plan met all criteria and investment minimums. Defendants however continued to keep the Plan's investments in share class "R3" which had a higher expense ratio, incurring a net expense ratio of 1.01% for 2022, 1.00% for 2023 and 1.04% for 2024. During this same time, share class "R6" had a net expense ratio of 0.66% for (as of December 29, 2021),[26] 0.64% (as of December 29, 2022)[27] and 0.69% (as of December 29, 2023).[28] The other identified shares classes, i.e. "I", also continued to have a lower net expense ratio, i.e. 0.76% (as of December 29, 2021), 0.75% (as of December 29, 2022), and 0.79% (as of December 29, 2023). From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfill their duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

49.    Investing Plan assets in higher share classes harms the Plan's participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants. Because the Plan could have invested in identical mutual funds with a lower share class, Defendants' actions were directly erosive to the Plan's growth. Defendants thus caused Plaintiffs and other Plan participants/ beneficiaries harm by not just forcing them to pay higher fees but also caused lost yield and returns as a result of those higher fees on the majority of investments offered through the Plan. The erosive

---

[26]    *See* Form 497K, MFS Research International Fund, Summary Prospectus (December 29, 2021) (As Amended March 1, 2022), sec.gov/Archives/edgar/data/798244/000110465922028086/tm227450d15_497k.htm.

[27]    *See* Form 497K, MFS Research International Fund, Summary Prospectus (December 29, 2022) (As Amended July 20, 2023), sec.gov/Archives/edgar/data/798244/000091293823000378/rif_sum.htm.

[28]    *See* Form 497K, MFS Research International Fund, Summary Prospectus (December 29, 2023), sec.gov/Archives/edgar/data/798244/000110465923129929/tm2332398d6_497k.htm.

effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

50.  In selecting share classes with a higher fee, Defendants demonstrated a lack of basic skill and prudence when selecting investments. A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[29]

51.  The Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. Simply put, given the choice of two identical investments – with the same assets, investment style, and management – Defendants chose the more expensive product. Defendants thus caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendants undermined the very purpose of the Plan to provide income security for participants/beneficiaries.

**B.  Defendants Wasted Participants' Money Because They Did Not Have a Prudent Methodology in Monitoring the Plan's Stable Value Fund**

52.  The single largest asset in the Plan during the Class Period was the MetLife Stable Value Fund ("MetLife SVF"). The MetLife SVF is a type of stable value fund, in the form of a group annuity contract issued by the Metropolitan Life Insurance Company and backed by assets

---

[29]  "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at
https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-shareclass-initiative.pdf.

in a pooled separate account. A prudent fiduciary, recognizing the importance of the fund in the Plan's investment lineup, would have taken great care in selecting and monitoring this investment option. Defendants did not.

53. A stable value fund is a unique investment available only in ERISA defined contribution plans and certain other tax-advantaged plans. A stable value fund is a conservative, capital preservation investment product typically composed of high quality, low risk investments. It is designed to provide steady, positive returns and pay a contractually guaranteed return known as a "crediting rate." The crediting rate is set by the contract and may be reset at predetermined intervals.[30] The crediting rate for the MetLife SVF was set in advance and reset annually, as provided in the contract.

54. A stable value account in a retirement plan is similar to a money market fund in that it provides liquidity and principal protection, and similar to a bond fund in that it provides consistent returns over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the fund transacts at book value. Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds.

---

[30] *See* generally Stable Value Investment Association, Knowledge, https://stablevalue.org/knowledge (follow links for "Glossary").

55.     In most cases, stable value products use a guaranteed investment contract, also known as "GICS" or "wraps", that have specialized risk and return characteristics. In the vast majority of cases, stable value funds are not mutual funds and are typically structured as: (1) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic account. Large plans often offer synthetic accounts, which are the least risky because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds. [31] Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As a result, they offer higher crediting rates. The third type are general account products where the funds are held unrestricted in the general account of the insurance carrier.

56.     The crediting rate – set in advance by the provider at its sole discretion – is not tied to the performance of the assets deposited into the stable value fund. Because the guaranteed crediting rate is set in advance, Defendants have both the opportunity and the duty to evaluate this investment in advance.

57.     Defendants did not have a prudent process for selecting or monitoring the performance of the MetLife SVF. While not all information is publicly available for comparison purposes[32], substantially similar products were available from other providers that would have provided substantially higher returns to the Plan participants.

---

[31]     Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relied on both the value of the associated assets and the financial backing of the wrap provider.

[32]     In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan

58.    For example, a prudent fiduciary would have compared the MetLife SVF to the stable value funds offered by other major competitors, such as the separate account products offered by MassMutual. These MassMutual separate account contracts would have also provided much higher returns than the MetLife SVF. A breakdown of these losses is provided below:

| Period Range | Defendant Hospital's stable value fund i.e. the MetLife SVF | Typical crediting rate for MassMutual Separate-Account GICs (%) | Excess Spread Fees | Excess Spread Fees (in USD) |
|---|---|---|---|---|
| 1Q 2018 | 2.10% | 4.22% | 2.12% | 56,424 |
| 2Q 2018 | 2.10% | 4.64% | 2.54% | 67,602 |
| 3Q 2018 | 2.10% | 4.68% | 2.58% | 68,666 |
| 4Q 2018 | 2.10% | 4.66% | 2.56% | 68,134 |
| 1Q 2019 | 2.35% | 4.66% | 2.31% | 66,703 |
| 2Q 2019 | 2.35% | 4.47% | 2.12% | 61,217 |
| 3Q 2019 | 2.35% | 4.41% | 2.06% | 59,484 |
| 4Q 2019 | 2.35% | 4.55% | 2.20% | 63,527 |
| 1Q 2020 | 2.35% | 4.03% | 1.68% | 65,350 |
| 2Q 2020 | 2.35% | 4.03% | 1.68% | 65,350 |
| 3Q 2020 | 2.35% | 4.03% | 1.68% | 65,350 |
| 4Q 2020 | 2.35% | 4.03% | 1.68% | 65,350 |
| 1Q 2021 | 1.80% | 4.03% | 2.23% | 89,919 |
| 2Q 2021 | 1.80% | 4.03% | 2.23% | 89,919 |
| 3Q 2021 | 1.80% | 4.03% | 2.23% | 89,919 |
| 4Q 2021 | 1.80% | 4.03% | 2.23% | 89,919 |
| 1Q 2022 | 1.20% | 4.03% | 2.83% | 130,600 |
| 2Q 2022 | 1.20% | 4.03% | 2.83% | 130,600 |
| 3Q 2022 | 1.20% | No data available | - | - |
| 4Q 2022 | 1.20% | No data available | - | - |
| 1Q 2023 | 1.95% | No data available | - | Appropriate data relating to the Plan's asset size is unavailable to |
| 2Q 2023 | 1.95% | No data available | - | |
| 3Q 2023 | 1.95% | 3.81% | 1.86% | |

sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility."

| | | | | |
|---|---|---|---|---|
| 4Q 2023 | 1.95% | 3.81% | 1.86% | calculates losses for this period. |
| Total: | | | | **$1,394,035** |

59.     Specifically, considering a specific product offered by MassMutual, the MassMutual Diversified SAGIC, had the following crediting rates after 2019: 4.03% (Apr. 1, 2020-June 30, 2022); 3.66% (Jan. 1, 2023-June 30, 2023); 3.81% (July 1, 2023-Dec. 31, 2023); and 3.49% (Apr. 1, 2024-June 30, 2024). These were much higher than the crediting rates the Plan received.

60.     Another competitor, TIAA Cref, also offered much better returns. Illustratively, a TIAA Cref product (the TIAA Cref Traditional Annuity Retirement Choice) offered the following higher crediting rates, resulting in substantial losses during the proposed Class period, as set forth below:

| Period Range | The Hospital's stable value fund | TIAA-CREF Traditional Annuity | Excess Spread Fees | Excess Spread Fees (in USD) |
|---|---|---|---|---|
| 1Q 2018 | 2.10% | 4.80% | 2.70% | 71,860 |
| 2Q 2018 | 2.10% | 4.80% | 2.70% | 71,860 |
| 3Q 2018 | 2.10% | 4.80% | 2.70% | 71,860 |
| 4Q 2018 | 2.10% | 4.80% | 2.70% | 71,860 |
| 1Q 2019 | 2.35% | 4.80% | 2.45% | 70,746 |
| 2Q 2019 | 2.35% | 4.80% | 2.45% | 70,746 |
| 3Q 2019 | 2.35% | 4.80% | 2.45% | 70,746 |
| 4Q 2019 | 2.35% | 4.80% | 2.45% | 70,746 |
| 1Q 2020 | 2.35% | 4.25% | 1.90% | 73,907 |
| 2Q 2020 | 2.35% | 4.25% | 1.90% | 73,907 |
| 3Q 2020 | 2.35% | 4.25% | 1.90% | 73,907 |
| 4Q 2020 | 2.35% | 4.25% | 1.90% | 73,907 |
| 1Q 2021 | 1.80% | 4.25% | 2.45% | 98,790 |
| 2Q 2021 | 1.80% | 4.25% | 2.45% | 98,790 |
| 3Q 2021 | 1.80% | 4.25% | 2.45% | 98,790 |
| 4Q 2021 | 1.80% | 4.25% | 2.45% | 98,790 |
| 1Q 2022 | 1.20% | 4.85% | 3.65% | 168,442 |
| 2Q 2022 | 1.20% | 6.10% | 4.90% | 226,128 |
| 3Q 2022 | 1.20% | 6.10% | 4.90% | 226,128 |

25

| 4Q 2022 | 1.20% | 6.60% | 5.40% | 249,202 |
|---------|-------|-------|-------|---------|
| 1Q 2023 | 1.95% | 6.33% | 4.38% | Appropriate data relating to the Plan's asset size is unavailable to calculates losses for this period. |
| 2Q 2023 | 1.95% | 6.33% | 4.38% | |
| 3Q 2023 | 1.95% | 6.75% | 4.80% | |
| 4Q 2023 | 1.95% | 6.75% | 4.80% | |
| Total: | | | | **$2,131,115** |

61.     Even the minimum guaranteed crediting rate offered by the TIAA Cref Product above is 1 – 3%, while the minimum guaranteed rate for the MetLife SVF is 1%.

62.     There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated: the product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows from the date the product is selected what the returns will be in advance. The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than a bond fund. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the MetLife SVF, generally continues to perform poorly, in a stable manner. A prudent fiduciary – that is, a fiduciary that monitors the investment and understands the pricing mechanism – would have known that MetLife SVF was underperforming and, being a *stable* value product, would continue to underperform in a stable manner.

63.     Defendants, to have a viable methodology, had to monitor and evaluate the returns on the stable value product as they were set such as to compare them to the returns of the dominant player in the industry. Had Defendants done anything prudent to monitor and evaluate the returns

– such as comparing the Plan returns to the returns of other leading stable value providers – Defendants would have learned that the MetLife SVF was an underperforming fund for the entire Class Period. Had Defendants done even a minimal amount of due diligence, they would have immediately recognized that this was a severely underperforming product and would have had no option but to remove the MetLife SVF option from the Plan.

64.    Defendants did not have to scour the marketplace to find a better performing fund. The terms and rates of stable value funds are published and readily available. All they had to do was look. Defendants simply did not bother to find a better deal for the Plan participants. They therefore did not exercise even a minimal amount of due diligence.

65.    This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $2.1 million of participants' retirement savings (or at least $1.3 million if the other option is considered). This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be in advance.

66.    A stable value product is less sensitive to changes in interest rates than conventional bond funds. Stable value funds are just that: stable. A stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the fund selected by Defendants, generally continues to perform poorly, also in a stable manner. A prudent fiduciary would have known that the MetLife SVF would underperform and that, being a stable value product, it would continue to underperform. Defendants should not

27

have selected the MetLife SVF. Certainly, as it continued to underperform, Defendants should have removed and replaced it.

**C.      Defendants Wasted Participants' Money Because They Did Not have a Prudent Methodology in Monitoring the Plan's excessive administrative expenses**

67.      Defendants have a duty to prudently select covered service providers. Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[33] The DOL has observed that:

> …the responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided. In addition, such process should be designed to avoid self-dealing, conflicts of interest or other improper influence….
>
> Soliciting bids among service providers at the outset is a means by which the fiduciary can obtain the necessary information relevant to the decision-making process. Whether such a process is appropriate in subsequent years may depend, among other things, upon the fiduciary's knowledge of a service provider's work product, the cost and quality of services previously provided by the service provider, the fiduciary's knowledge of prevailing rates for the services, as well as the cost to the plan of conducting a particular selection process. Regardless of the method used, however, the fiduciary must be able to demonstrate compliance with ERISA's fiduciary standards.

68.      Administrative services are a necessary service for every defined contribution plan. The market for recordkeeping and administrative services is highly competitive. There are numerous recordkeepers or service providers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plan and will readily respond to a request

---

[33]      DOL Info. Letter to Theodore Konshak (Dec. 1, 1997), available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/12-01-1997.

for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

69.     Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. There are two types of essential recordkeeping services provided by all national recordkeepers for plans with significant bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service, meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis). These services include, but are not limited to, the following:

- Basic account recordkeeping (e.g. investment and vesting records);

- Transaction processing;

- Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, e.g., summary plan descriptions);

- Maintenance of an employer stock fund (if needed);

- Plan document services, including updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

- Plan consulting services, including assistance in selecting the investment lineup offered to participants;

- Accounting and audit services, including the preparation of annual reports, e.g., Form 5500s[34];

---

[34]     In terms of service codes listed on a Form 5500, there is virtually no uniformity in the manner that Form 5500s are completed; there are multiple ways to complete a Form 5500 with respect to the same services performed for a retirement plan receiving the same services and there

- Compliance support, including assistance interpreting plan provisions and ensuring plan operation complies with legal requirements and plan provisions (excluding separate legal services provided by a third-party law firm); and

- Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

70.     These services are offered by all recordkeepers for one price (typically at a per capita rate), regardless of the services chosen or utilized by a plan. Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services; any claim that recordkeeping expenses depend upon the service level provided to a plan is both false and frivolous. Nonetheless, fiduciary-defendants all too often attempt to stave off breach of fiduciary duty claims by disingenuously asserting that the cost of such services depends upon service level, even though such an assertion is plainly untrue based upon the actual marketplace for such services.

71.     The second type of essential administrative services provided by all national recordkeepers, often have separate, additional fees based on the conduct and use of individual participants. These fees are distinct from the above arrangement and ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These typically include, but are not limited to, the following: loan processing; brokerage

---

is essentially no penalty associated with inaccurately completing a Form 5500. As a result, any person that compares the service codes on a Form 5500 in an effort to determine whether the same or similar services are being provided to a given retirement plan belies a fundamental misunderstanding of how Form 5500s work, how they are completed, and what they actually reflect and show. Thus, the Court should eschew any analysis on the basis of service codes in a Form 5500 since any such analysis only amounts to an effort to mislead and an invitation to err.

services/account maintenance (if offered by the plan); iii. Distribution services; and iv. Processing of qualified domestic relations orders.

72.    All national recordkeepers have the capability to provide all of the aforementioned services to large defined contribution plans, including those smaller than the Plan. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all offer the same bundles and combinations of services. Accordingly, as noted above, the market for defined contribution plan recordkeeping and administrative services has become increasingly price competitive

73.    The cost of administrative services typically depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing administrative services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 15,000 participants can negotiate a much lower per participant fee for administrative services than a plan with 1,000 participants. As a result, it is axiomatic in the retirement plan services industry that: (1) a plan with more participants can receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) as participant counts increase, the effective per-participant fee should decrease, assuming the same services are provided.

74.    Informed, prudent plan fiduciaries are aware of these cost structure dynamics and marketplace realities and will leverage the plan's participant count to obtain lower effective per participant fees.

75.    When selecting a service provider or a recordkeeper, a fiduciary of a large plan like the Plan at issue, must solicit competitive bid proposals from several recordkeepers. The plan

fiduciary should require the recordkeeper to identify, not only the administrative services and their cost, but also the cost of proprietary products – that is, investments offered by the recordkeeper or its affiliates – that the Plan must select. Recognizing that administrative services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.

76.     To monitor administrative costs, a prudent fiduciary must engage in a process called "benchmarking" to verify that the recordkeeper selected charges no more than reasonable fees. This involves, at the very least, comparing the cost of the proposed recordkeeper against the costs of the leading providers in the industry. Benchmarking is necessary both at the time a recordkeeper is selected, to verify the initial fees are reasonable, and at regular intervals thereafter. In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct payments, income from stable value funds, fees from separate accounts, revenue share from mutual funds, among other sources. To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, a prudent fiduciary of a large defined contribution plan must also engage in a process of putting the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years and monitor administrative costs regularly within that period.

77.     In this case, based on information available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeeper Transamerica, the Plan's active participant level between 2851 to 3205 during the Class Period, and the market, the outside limit of a reasonable administrative fee for the Plan should have been

no more than $70 per participant for the Class Period.[35] Here, Plan participants were paying excess

fees in the range of $115 - $175. A summary of total losses suffered by the Plan participants is

provided below:

| Year | Average Administrative expenses paid by the Plan per Active Plan participants (in USD) | Total Administrative expenses paid by the Plan | No. of Active Plan Participants by end of the Year i.e. [6a(2) participants] | Administrative expenses at $70 per Active Plan Participant | Loss suffered by the Plan |
|---|---|---|---|---|---|
| 2022 | 155.38 | 497,990 | 3205 | 224,350 | 273,640 |
| 2021 | 174.73 | 537,114 | 3074 | 215,180 | 321,934 |
| 2020 | 133.73 | 407,201 | 3045 | 213,150 | 194,051 |
| 2019 | 124.05 | 367,821 | 2965 | 207,550 | 160,271 |
| 2018 | 115.59 | 329,535 | 2851 | 199,570 | 129,965 |
| Total losses suffered by the Plan | | | | | $1,079,861 |

78.    For the entire Class Period, the average fees paid was substantially higher than the

average paid by other substantially similar plans, which is clear and compelling evidence that the

reasonable market rate was lower than what the Plan was paying since these comparable plans

---

[35]    *See*, 17th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2022 (March 2023), available at
https://www.nepc.com/wp-content/uploads/2023/03/2022-NEPC-DC-Plan-Trends-Fees-Survey-Results_Final.pdf; *See also* 16th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2021 (February 2022), available at
https://www.nepc.com/wp-content/uploads/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf; 15th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2020, available at
NEPC-Horizontal-InvestorForce-Compatible.pptx (hubspotusercontent00.net);
14th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2019, available at
https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

were able to negotiate lower fees for materially identical services. The tables below list the administrative fees paid by similarly sized defined contribution plans to several different high-quality, national recordkeepers providing materially identical services, which represent the prices available to the Plan during the Class Period. The tables also indicate the number of participants and assets of each plan.

**2018**

| | Plan | Total Number of Active Participants at the end of 2018 | Total Number of Assets at the end of 2018 (in USD) | Total Administrative Expenses (in USD) | Recordkeeper | Avg.[36] (in USD) |
|---|---|---|---|---|---|---|
| 1. | Johns Manville Employees 401(k) Plan | 2703 | 528,893,975 | 109,651 | Fidelity Investments | 41 |
| 2. | Hilcorp Energy Company 401(k) Savings Plan | 2386 | 230,269,275 | 80,028 | T Rowe Price Rps Inc | 34 |
| 3. | The Gores Group, LLC - 401k Plan | 6,112 | 461,384,147 | 320,143 | Great-West Life & Annuity Insurance | 52 |
| 4. | Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 2,987 | 445,637,999 | 85,241 | Vanguard Fiduciary Trust Company | 29 |
| 5. | John Wiley & Sons, Inc. Employees' Savings Plan | 2,058 | 400,167,000 | 109,078 | Vanguard Fiduciary Trust Company | 53 |
| 6. | Smithfield Foods, Inc. Salaried 401(k) Plan | 5,567 | 500,178,777 | 281,307 | Great-West Life & Annuity Insurance | 51 |
| 7. | Spire Employee Savings Plan | 3,435 | 601,477,337 | 150,198 | Fidelity Investments | 44 |

---

[36]    Average per Active Plan Participant.

| | Plan | | | | | |
|---|---|---|---|---|---|---|
| 8. | Sierra Pacific Ind Employees' Retirement Plan | 4,932 | 400,434,686 | 54,461 | The Vanguard Group, Inc. | 11 |
| 9. | Spirit Airlines, Inc. Pilots' Retirement Savings Plan | 2,110 | 304,824,993 | 41,643 | Schwab Retirement Plan Services Inc. | 20 |
| 10. | Toll Brothers 401k Savings Plan | 4,068 | 349,810,279 | 180,122 | Prudential Retirement | 44 |
| 11. | Yardi Systems, Inc. 401(K) Profit Sharing Plan | 3,185 | 240,133,267 | 102,301 | Fidelity Investments | 32 |
| 12. | West Pharmaceutical Services, Inc. 401(K) Plan | 2,985 | 252,030,606 | 106,040 | The Vanguard Group, Inc. | 36 |
| 13. | Fulton Financial Corporation 401(K) Retirement Plan | 3,555 | 339,999,431 | 141,749 | Fulton Financial Advisors | 40 |
| 14. | Meritor, Inc. Savings Plan | 3,532 | 504,798,980 | 113,539 | T Rowe Price Rps Inc. | 32 |
| 15. | Oppenheimer & Co. Inc. 401(K) Plan | 2,875 | 380,237,990 | 113,973 | John Hancock Retirement Plan Services | 40 |
| 16. | Webster Bank Retirement Savings Plan | 3,398 | 447,818,471 | 40,947 | Fidelity Workplace Services | 12 |
| 17. | Hilti Retirement Savings Plan | 3,029 | 388,597,272 | 40,096 | Prudential Retirement | 13 |

## **2019**

| | Plan | Total Number of Active Participants at the end of 2019 | Total Number of Assets at the end of 2019 (in USD) | Total Admin. Expenses (in USD) | Record-keeper | Avg. cost[37] |
|---|---|---|---|---|---|---|
| 1. | Johns Manville Employees 401(k) Plan | 3,188 | 630,148,969 | 104,940 | Fidelity Investments | 33 |
| 2. | Hilcorp Energy Company 401(k) Savings Plan | 2,447 | 314,245,668 | 60,245 | T Rowe Price Rps Inc. | 25 |

---

[37] Average per Active Plan Participant.

| 3. | The Gores Group, LLC - 401k Plan | 5,265 | 512,521,730 | 300,108 | Great-West Life & Annuity Insurance | 57 |
|---|---|---|---|---|---|---|
| 4. | Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 2,998 | 541,222,164 | 170,880 | The Vanguard Group, Inc. | 57 |
| 5. | John Wiley & Sons, Inc. Employees' Savings Plan | 2,084 | 493,887,442 | 126,435 | Vanguard Fiduciary Trust Company | 61 |
| 6. | Smithfield Foods, Inc. Salaried 401(k) Plan | 5,624 | 587,410,642 | 286,741 | Great-West Life & Annuity Insurance | 51 |
| 7. | Spire Employee Savings Plan | 3,590 | 707,440,267 | 158,476 | Fidelity Investments | 44 |
| 8. | Sierra Pacific Ind Employees' Retirement Plan | 4,932 | 480,328,580 | 145,005 | The Vanguard Group, Inc. | 29 |
| 9. | Spirit Airlines, Inc. Pilots' Retirement Savings Plan | 2,135 | 438,972,008 | 45,582 | Schwab Retirement Plan Services Inc | 21 |
| 10. | Toll Brothers 401k Savings Plan | 4,193 | 445,825,604 | 226,389 | Prudential Retirement | 54 |
| 11. | Yardi Systems, Inc. 401(K) Profit Sharing Plan | 3,437 | 326,028,342 | 124,426 | Fidelity Investments | 36 |
| 12. | West Pharmaceutical Services, Inc. 401(K) Plan | 3,152 | 325,708,872 | 104,032 | The Vanguard Group, Inc | 33 |
| 13. | Fulton Financial Corporation 401(K) Retirement Plan | 3,544 | 411,918,831 | 150,207 | Fulton Financial Advisors | 42 |
| 14. | Meritor, Inc. Savings Plan | 3,775 | 617,636,285 | 249,800 | T Rowe Price Rps Inc. | 66 |
| 15. | Oppenheimer & Co. Inc. 401(K) Plan | 2,871 | 456,441,313 | 101,987 | John Hancock Retirement Plan Services | 36 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 16. | Webster Bank Retirement Savings Plan | 3,355 | 551,246,121 | 41,701 | Fidelity Workplace Services | 12 |
| 17. | Hilti Retirement Savings Plan | 3,080 | 474,288,410 | 56,006 | Prudential Retirement | 18 |

### 2020

| | Plan | Total Number of Active Participants at the end of 2020 | Total Number of Assets at the end of 2020 (in USD) | Total Admin. Expenses (in USD) | Record-keeper | Avg. cost[38] |
|---|---|---|---|---|---|---|
| 1. | Johns Manville Employees 401(k) Plan | 3,158 | 705,900,503 | 161,135 | Fidelity Investments | 51 |
| 2. | Hilcorp Energy Company 401(k) Savings Plan | 3,328 | 417,563,770 | 211,046 | T Rowe Price Rps Inc. | 63 |
| 3. | The Gores Group, LLC - 401k Plan | 4,652 | 539,062,678 | 287,439 | Great-West Life & Annuity Insurance | 62 |
| 4. | Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 3,039 | 619,073,281 | 202,010 | The Vanguard Group, Inc. | 66 |
| 5. | John Wiley & Sons, Inc. Employees' Savings Plan | 2,660 | 586,465,655 | 136,851 | Vanguard Fiduciary Trust Company | 51 |
| 6. | Smithfield Foods, Inc. Salaried 401(k) Plan | 5,346 | 644,466,966 | 295,919 | Great-West Life & Annuity Insurance | 55 |
| 7. | Spire Employee Savings Plan | 3,604 | 703,191,693 | 147,691 | Fidelity Investments | 41 |
| 8. | Sierra Pacific Ind Employees' Retirement Plan | 4,978 | 538,581,342 | 146,702 | The Vanguard Group, Inc. | 29 |
| 9. | Spirit Airlines, Inc. Pilots' Retirement Savings Plan | 2,568 | 585,799,882 | 69,669 | Schwab Retirement Plan Services Inc | 27 |

---

[38] Average per Active Plan Participant.

| | Plan | | | | | |
|---|---|---|---|---|---|---|
| 10. | Toll Brothers 401k Savings Plan | 3,670 | 521,202,812 | 219,202 | Prudential Retirement | 60 |
| 11. | Yardi Systems, Inc. 401(K) Profit Sharing Plan | 3,654 | 420,500,270 | 125,389 | Fidelity Investments | 27 |
| 12. | West Pharmaceutical Services, Inc. 401(K) Plan | 3,939 | 418,790,246 | 143,088 | The Vanguard Group, Inc | 36 |
| 13. | Fulton Financial Corporation 401(K) Retirement Plan | 3,270 | 473,669,338 | 139,356 | Fulton Financial Advisors | 43 |
| 14. | Meritor, Inc. Savings Plan | 3,249 | 653,871,812 | 193,237 | T Rowe Price Rps Inc. | 59 |
| 15. | Oppenheimer & Co. Inc. 401(K) Plan | 2,809 | 541,895,916 | 101,385 | John Hancock Retirement Plan Services | 36 |
| 16. | Webster Bank Retirement Savings Plan | 3,362 | 651,318,383 | 117,729 | Fidelity Workplace Services | 35 |
| 17. | Hilti Retirement Savings Plan | 3,218 | 540,852,435 | 149,751 | Prudential Retirement | 47 |

## **2021**

| | Plan | Total Number of Active Participants at the end of 2021 | Total Number of Assets at the end of 2021 (in USD) | Total Admin. Expenses (in USD) | Record-keeper | Avg. cost[39] |
|---|---|---|---|---|---|---|
| 1. | Johns Manville Employees 401(k) Plan | 3,226 | 787,713,751 | 243,475 | Fidelity Investments | 75 |
| 2. | Hilcorp Energy Company 401(k) Savings Plan | 3,378 | 539,117,413 | 250,064 | T Rowe Price Rps Inc. | 74 |
| 3. | The Gores Group, LLC - 401k Plan | 4,465 | 553,217,511 | 303,726 | Great-West Life & Annuity Insurance | 68 |

---

[39]    Average per Active Plan Participant.

| | | | | | | |
|---|---|---|---|---|---|---|
| 4. | Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 3,220 | 704,561,206 | 207,472 | The Vanguard Group, Inc. | 64 |
| 5. | John Wiley & Sons, Inc. Employees' Savings Plan | 3,130 | 675,832,282 | 201,649 | Vanguard Fiduciary Trust Company | 64 |
| 6. | Smithfield Foods, Inc. Salaried 401(k) Plan | 4,957 | 696,539,380 | 282,652 | Great-West Life & Annuity Insurance | 57 |
| 7. | Spire Employee Savings Plan | 3,701 | 750,442,859 | 207,675 | Fidelity Investments | 56 |
| 8. | Sierra Pacific Ind Employees' Retirement Plan | 4,906 | 639,430,582 | 270,895 | The Vanguard Group, Inc. | 55 |
| 9. | Spirit Airlines, Inc. Pilots' Retirement Savings Plan | 2,763 | 754,518,736 | 144,683 | Schwab Retirement Plan Services Inc | 52 |
| 10. | Toll Brothers 401k Savings Plan | 4,283 | 616,186,907 | 210,779 | Prudential Retirement | 49 |
| 11. | Yardi Systems, Inc. 401(K) Profit Sharing Plan | 3,990 | 518,675,943 | 169,701 | Fidelity Investments | 43 |
| 12. | West Pharmaceutical Services, Inc. 401(K) Plan | 4,149 | 514,861,682 | 171,827 | The Vanguard Group, Inc | 41 |
| 13. | Fulton Financial Corporation 401(K) Retirement Plan | 3,142 | 528,868,970 | 127,806 | Fulton Financial Advisors | 41 |
| 14. | Meritor, Inc. Savings Plan | 3,542 | 720,056,682 | 131,346 | T Rowe Price Rps Inc. | 37 |
| 15. | Oppenheimer & Co. Inc. 401(K) Plan | 2,804 | 624,604,097 | 100,929 | John Hancock Retirement Plan Services | 36 |
| 16. | Webster Bank Retirement Savings Plan | 2,854 | 718,668,576 | 95,762 | Fidelity Workplace Services | 34 |
| 17. | Hilti Retirement Savings Plan | 3,294 | 608,559,040 | 107,663 | Prudential Retirement | 33 |

**2022**

| | Plan | Total Number of Active Participants at the end of 2018 | Total Number of Assets at the end of 2018 (in USD) | Total Admin. Expenses (in USD) | Record-keeper | Avg. cost[40] |
|---|---|---|---|---|---|---|
| 1. | Johns Manville Employees 401(k) Plan | 5,755 | 788,090,140 | 293,898 | Fidelity Investments | 51 |
| 2. | Hilcorp Energy Company 401(k) Savings Plan | 3,430 | 502,623,273 | 235,072 | T Rowe Price Rps Inc. | 69 |
| 3. | The Gores Group, LLC - 401k Plan | 5,909 | 423,896,282 | 279,946 | Great-West Life & Annuity Insurance | 47 |
| 4. | Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 3,401 | 606,255,279 | 226,561 | The Vanguard Group, Inc. | 67 |
| 5. | John Wiley & Sons, Inc. Employees' Savings Plan | 3,565 | 561,621,928 | 206,512 | Vanguard Fiduciary Trust Company | 58 |
| 6. | Smithfield Foods, Inc. Salaried 401(k) Plan | 5,144 | 609,602,621 | 283,184 | Empower Annuity Insurance Company | 55 |
| 7. | Spire Employee Savings Plan | 3,537 | 568,051,917 | 182,104 | Fidelity Investments | 51 |
| 8. | Sierra Pacific Ind Employees' Retirement Plan | 5,510 | 540,420,554 | 229,904 | The Vanguard Group, Inc. | 42 |
| 9. | Spirit Airlines, Inc. Pilots' Retirement Savings Plan | 3,163 | 691,179,431 | 190,017 | Schwab Retirement Plan Services Inc | 60 |
| 10. | Toll Brothers 401k Savings Plan | 4,532 | 509,934,769 | 227,920 | Prudential Retirement | 50 |
| 11. | Yardi Systems, Inc. 401(K) Profit Sharing Plan | 4,510 | 466,092,755 | 321,841 | Fidelity Investments | 71 |

---

[40]    Average per Active Plan Participant.

| 12. | West Pharmaceutical Services, Inc. 401(K) Plan | 4,447 | 412,346,793 | 200,259 | The Vanguard Group, Inc | 45 |
|-----|-----|-----|-----|-----|-----|-----|
| 13. | Fulton Financial Corporation 401(K) Retirement Plan | 3,325 | 431,846,378 | 196,430 | Fulton Financial Advisors | 59 |
| 14. | Meritor, Inc. Savings Plan | 4,265 | 612,900,742 | 220,268 | T Rowe Price Rps Inc. | 52 |
| 15. | Oppenheimer & Co. Inc. 401(K) Plan | 2,814 | 516,771,931 | 117,869 | John Hancock Retirement Plan Services | 42 |
| 16. | Webster Bank Retirement Savings Plan | 2,988 | 575,525,433 | 83,770 | Fidelity Investments | 28 |
| 17. | Hilti Retirement Savings Plan | 3,520 | 523,145,772 | 129,544 | Empower Annuity Insurance Company of America (formerly known as Prudential Retirement Insurance and Annuity Company) | 37 |

79.     The administrative expenses for each similar comparable plan in the table above are pulled from publicly available Form 5500 filings and include all the disclosed direct compensation paid to the recordkeeper, as well as all indirect compensation. Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the administrative expenses. In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the administrative expenses. In other plans, all of the revenue sharing is returned to the plans and is therefore not

41

included in the fee calculation. The comparable plans above received at least the same recordkeeping and administrative services received by the Plan. Therefore, the fees in the tables above are apt comparisons in that they include all the fees being charged by each recordkeeper to provide the similar services to similar defined contribution plans.

80.     As the tables above indicate, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in some cases smaller, participant counts. Indeed, it is more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees. Prudent fiduciaries engage in regular examination and benchmarking of a plan's fees, including by soliciting bids (e.g., requests for information and requests for proposal) from incumbent and competitor service providers. In light of the amounts remitted to Transamerica throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking (including meaningful competitive bidding) of the administrative expenses of the Plan to those of other similarly sized defined contribution plans, or they were complicit in paying grossly excessive fees.

81.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged and its failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan participants. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable fees the Plan paid. Every dollar of unreasonable administrative fees cost participants a retirement dollar that was no longer available for investment.

## CLASS ACTION ALLEGATIONS

82.     ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach

of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. See 29 U.S.C. § 1132(a)(2).

83.    Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify a class action on behalf of participants and beneficiaries of the Plan. Plaintiffs seek to certify the following Class, and to be appointed as representatives ("Named Plaintiffs") of the Class:

> All participants in or beneficiaries of the Retirement Plan of Saratoga Hospital from six years prior to the filing of the initial complaint in this matter through the date of judgment, except Defendants.

84.    This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

    a.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2022, the Plan had over 4031 participants with account balances.

    b.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants are fiduciaries to the Plan;

- whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

- whether Defendants breached their duty to monitor other fiduciaries and parties of interest to the Plan; and

- the extent of damage sustained by Class members and the appropriate measure of damages

85.     Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general.

86.     Plaintiffs have no interests that conflict with those of the Class.

87.     Defendants do not have any unique defenses against the Plaintiffs that would interfere with their representation of the Class.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Breach of Fiduciary Duties

89.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

90.     Defendants failed to discharge their duties under 29 U.S.C. § 1104(a)(1)(A) and (B). They were obligated to discharge their duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

44

91.     Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

92.     As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached their fiduciary duties in various ways. Specifically, among other failings, Defendants (i) failed to investigate the availability of lower-cost share classes of certain mutual funds; and (ii) failed to prudently select and monitor the Plan's stable value fund, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out its investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance.

93.     Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

94.     As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.

45

## COUNT II

### Breach of Fiduciary Duty to Monitor Excessive Fees

95.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     Defendants were obligated to discharge their fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A)(ii). In investing and managing the Plan's assets, Defendants were permitted to incur only appropriate and reasonable costs.

97.     Defendants failed to defray the Plan's administrative expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's administrative expenses were excessive, resulting in losses to the Plan participants.

98.     Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

A.     Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Find and declare that Defendants breached their fiduciary duties as described above;

46

C.      Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

E.      Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

F.      Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

G.      Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

H.      Order the payment of interest to the extent it is allowed by law; and

I.      Grant other equitable or remedial relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable by law.

Dated: July 29, 2025                        Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Gustavo F. Bruckner*
                                            Gustavo F. Bruckner
                                            Samuel J. Adams
                                            Ankita Sangwan
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            gfbruckner@pomlaw.com
                                            sjadams@pomlaw.com
                                            asangwan@pomlaw.com

47

*Attorneys for Plaintiffs*